LEXSEE 1998 CONN. SUPER. LEXIS 1883

Thomas Casper v. Combustion Engineering, Inc. et al.

CV 970570516S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HARTFORD-NEW BRITAIN, AT HARTFORD

1998 Conn. Super. LEXIS 1883

June 17, 1998, Decided
June 23, 1998, Filed

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Motion to Strike granted as to the Second and Third Counts of the Complaint and denied as to the First, Fifth, Sixth, and Seventh Counts of the Complaint.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff ex-employee filed an action against defendants, corporations, president, employee, and individual, alleging breach of contract, wrongful termination, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent misrepresentation. Defendants filed motions to strike multiple counts of the ex-employee's complaint.

**OVERVIEW:** The corporations fired the ex-employee for alleged misconduct following an internal investigation. The ex-employee filed a multiple-count complaint to challenge his dismissal. The court held (1) there were questions of fact as to whether an implied-in-fact contract existed such that the ex-employee could be fired for cause only, (2) the ex-employee failed to state an actionable claim for wrongful termination because he was an at-will employee and he did not allege a cognizable public policy violation resulting from the termination, (3) the ex-employee could not maintain an independent claim for breach of the implied covenant of good faith and fair dealing, (4) the ex-employee's allegations that defendants engaged in extreme and outrageous behavior were sufficient to state claims for intentional and negligent infliction of emotional distress, and (5) there were issues of fact as to whether defendants engaged in negligent misrepresentation.

**OUTCOME:** The court granted in part and denied in part the motions to strike.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**JUDGES:** Aurigemma, J.

**OPINIONBY:** AURIGEMMA

**OPINION:** MEMORANDUM OF DECISION ON MOTIONS TO STRIKE

The defendants Combustion Engineering, Inc. ("Combustion"), Asea Brown Boveri, Inc. ("Asea"), Richard Cronin and Thomas Sacco have moved to strike the First through Third and the Fifth through Seventh Counts of Plaintiff's Complaint. The defendant Kevin Downs has moved to strike the Fifth through Seventh Counts of that Complaint.

Allegations of the Complaint

The Complaint alleges that from September 21, 1982 to May 23, 1995, plaintiff was employed by defendants Combustion Engineering and Asea (collectively the "Corporate Defendants") "in various positions, including most recently Supply Manager." (Complaint, 7.) The

plaintiff received favorable reviews, including promotions and pay raises, throughout his tenure. (Complaint 8.) In January 1995, the president of Combustion and [*2] Asea, Richard F. Cronin ("Cronin") announced that the corporation would begin an internal investigation, with employee interviews, into "inappropriate business practices." (Complaint, 9.) On May 19, 1995, the plaintiff was interrogated in a locked conference room by Kevin Downs ("Downs") (acting under the authority of the corporate legal counsel). (Complaint, 12 and 13.) The plaintiff was required to sign a confidentiality agreement, which prohibited the plaintiff from discussing the interview with anyone except for his wife. (Complaint, 14.) Downs showed the plaintiff a 3-inch binder with the plaintiff's name displayed on the cover and suggested to the plaintiff that he had detailed information about the plaintiff, his family and his work habits. Downs also informed the plaintiff that information was gathered during the business practices audit and investigation about employees through "clandestine surveillance, wire-tapping, eavesdropping and anonymous informants" (Complaint, 15). After the interrogation had continued for several hours Downs accused the plaintiff of having a secret relationship with, and accepting "bribes, lunches, gifts and vacations" from John Nicolace ("Nicolace"), [*3] a sales representative. (Complaint, 15.) The plaintiff vigorously denied the accusations about this improper relationship with Nicolace. (Complaint, 16.)

Downs represented to the plaintiff that the investigation had revealed that the plaintiff had placed at least three purchase orders on behalf of the Corporate Defendants through Nicolace, including one order in excess of $ 2 million. Plaintiff advised Downs that he had no recollection of any such order. (Complaint, 18.) Downs further represented that if the plaintiff admitted exercising "poor judgment" regarding his relationship with Nicolace, the Corporate Defendants' president Cronin would exercise his discretion and plaintiff would not be terminated. Otherwise, if plaintiff failed to acknowledge any wrongdoing, the plaintiff would be terminated immediately for fraud and a lack of integrity. (Complaint, 20.)

Downs handed the plaintiff an eight-page typed document entitled "Original Statement" one page at a time without giving the plaintiff the ability to read the document as a whole. Downs then ordered the plaintiff to sign the top and bottom of each page and execute the statement on the final page acknowledging that all of [*4] the statements there were "true and correct." (Complaint, 22.) Downs represented that if the plaintiff signed the statement as written it would be viewed as the exercise of poor judgment and the plaintiff would not be terminated, but if he failed to sign the statement it would be viewed as insubordination. (Complaint, 24.) The plaintiff signed the false statement because he believed that it would be insubordination not to sign it and he was late for an appointment. (Complaint, 25.)

Downs then ordered the plaintiff to produce to him on the following Monday morning, plaintiff's tax records for the previous five years. (Complaint, 26.) At 3:00 p.m. on the following Monday the plaintiff met with Downs and informed him that the tax information would not be available until the following day. On the following day [the Complaint does not say whether the plaintiff produced his tax records] the plaintiff was terminated for "repeated willful misconduct" based solely on the Statement he had signed. (Complaint, 30.)

The plaintiff and fourteen other employees were terminated for alleged misconduct as a result of the internal investigation on May 23, 1995. (Complaint, 32.) On May 23, [*5] the plaintiff was escorted out of the building by security personnel with security vehicles positioned outside in full view of his co-workers. (Complaint, 33.) Combustion and Asea, through Cronin, announced the terminations to all employees and then, on May 24 and May 26, "caused to be published in *The Journal Inquirer* and *The Hartford Courant* the statement that all employees terminated on May 23, 1995, were terminated for improper business conduct." (Complaint, 35.)

Discussion of Law and Ruling

The function of a motion to strike is to test the legal sufficiency of a pleading. Practice Book 152; *Ferryman v. Groton*, 212 Conn. 138, 142, 561 A.2d 432 (1989); *Mingachos v. CBS, Inc.*, 196 Conn. 91, 108, 491 A.2d 368 (1985). In deciding a motion to strike the trial court must consider as true the factual allegations, but not the legal conclusions set forth in the complaint. *Liljedahl Bros, Inc. v. Grigsby*, 215 Conn. 345, 348, 576 A.2d 149 (1990); *Blancato v. Feldspar Corp.*, 203 Conn. 34, 36, 522 A.2d 1235 (1987).

Implied Contract

In the First Count the plaintiff claims that he had an implied contract of employment under which he could not be terminated [*6] without good cause. Under Connecticut law both contracts of permanent employment or for an indefinite term of employment are terminable at will by the employer, *Battista v. United Illuminating Co.*, 10 Conn. App. 486, 495, 523 A.2d 1356 (1987), without any requirement that the employer have good cause for such termination. *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 474, 427 A.2d 385 (1980).

"A contract implied in fact, like an express contract, depends on actual agreement. *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 211 n.2, 520 A.2d 217 (1987); *Therrien v. Safeguard Mfg. Co.*, 180 Conn. 91, 94, 429 A.2d 808 (1980); *Brighenti v. New Britain Shirt Corporation*, 167 Conn. 403, 406, 356 A.2d 181 (1974); *Corriveau v. Jenkins Bros.*, 144 Conn. 383, 387, 132 A.2d 67 (1957)." *Coelho v. Posi-Seal International, Inc.*, 208 Conn. 106, 111-12, 544 A.2d 170 (1988). Accordingly, to prevail on his wrongful termination claim, "which alleged the existence of an implied agreement between the parties, the plaintiff had the burden of proving by a fair preponderance of the evidence that [the defendant] had agreed, either by words [*7] or action or conduct, to undertake [some] form of actual contract commitment to him under which he could not be terminated without just cause [following progressive disciplinary measures]. *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, supra 212 n.2; *Therrien v. Safeguard Mfg. Co.*, supra, [180 Conn. at] 94-95." 208 Conn. at 112.

The plaintiff alleges that his employment contract is implied in the following: In January 1995 when the Corporate Defendants announced that they would undertake an internal investigation relating to improper business practices, they further announced that the investigation would be conducted in a manner "consistent with fairness and thoroughness." (Complaint, 9.) Thereafter in March of 1995 the Corporate Defendants stated in an announcement relating to the investigation, "our goal is to ensure an environment exists that enables all CES employees to continue to prosper by dealing fairly and honestly with each other . . ." (Complaint, 10.)

The foregoing representations cannot form the basis of an implied contract. Every contract requires consideration. An employee's accepting employment and/or relocating to accept employment has been [*8] held to be sufficient consideration to support promises by an employer which are made prior to the commencement of the employment relationship. An employee remaining on the job and declining to seek other employment is sometimes deemed to be consideration to support an employer's promise made after the employment relationship commences. *Coelho v. Posi-Seal International, Inc.*, 208 Conn. 106, 118, 544 A.2d 170 (1988); *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 564-65, 479 A.2d 781. The foregoing representations on which the plaintiff relies to form the basis of his implied contract were made at the same time as Corporate Defendants commenced their investigation into alleged wrongdoing, by the plaintiff and other employees. The plaintiff has not alleged any consideration which he gave to support those alleged promises, or any action he took in detrimental reliance thereon. It is inconceivable that there was any consideration given by the plaintiff to support such alleged promises and, therefore, they cannot form the basis of his implied contract claim.

The plaintiff alleges the following to support his claim of an implied contract that he could only be fired for good cause. The Corporate [*9] Defendants disseminated on a regular basis a "Standards of Business Conduct" handbook which stated:

   a. One of the strengths, central to all our businesses, is a commitment to the highest standard of business conduct.

   b. Protecting our reputation requires each one of us--officers and employees TO make sound, ethical judgments every day--the kind we can sleep with at night.

   c. One of the hallmarks of a Company's reputation for integrity is its respect for, and compliance with, those laws and regulations, both domestic and foreign, that apply to its business.

   d. Many of the [Corporate Defendants'] activities are not the subject of laws and regulations. In those instances, rules of fairness will govern our conduct at all times, and

   e. A work environment in which every employee is treated equitably and with respect benefits everyone. All employees are expected to comply with relevant laws, obligations and company policies applicable to decision and conduct in the workplace. Compliance includes, but is not limited to: avoiding all forms of verbal or non-verbal harassment (sexual, racial, ethnic, religious, etc); [and] treating [*10] each other with respect. (Complaint, 37.)

The "Standards of Business Conduct" handbook also included that: "All information transmitted within the Company must be honest and well founded; misrepresentations and shading of information that creates a misleading business picture will not be tolerated"; "Information concerning employees must be treated in confidence, in accordance with policies and

procedures established by the Senior Vice President Human Resources"; and "Compliance [with the Standards of Business Conduct] will be a factor in periodic performance appraisals, Violations of [the Corporate Defendants'] policies will result in the taking of appropriate action up to and including discharge from employment." (Complaint, 38.)

Finally the plaintiff alleges that the Corporate Defendants' policies and procedures which included the giving of written warnings, the opportunity to rebut any claim of wrongdoing and placing employees on probation prior to terminating them created an implied contract that the plaintiff could only be terminated for cause. (Complaint, 38.)

In *Reynolds v. Chrysler First Comm. Corp.*, 40 Conn. App. 725, 673 A.2d 573 (1996), the Appellate [*11] Court upheld a summary judgment granted in favor of the employer where the employee alleged that the employer's regular use of progressive discipline policies gave rise to an implied contract. The Court held that the employee's understanding alone was insufficient evidence of the formation of a contract:

> "A contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties." *Christensen v. Bic Corp.*, 18 Conn. App. 451, 458, 558 A.2d 273 (1989). "The mere fact that the plaintiff believed the guidelines to constitute a contract does not bind [the defendant] without some evidence that it intended to be bound to such a contract. See *Brighenti v. New Britain Shirt Corporation*, [supra, 167 Conn. 403 at 407, 356 A.2d 181]." 18 Conn. App. at 458.

40 Conn. App. at 730.

The plaintiff may well have "plucked phrases out of context" in alleging his implied contract claim. Even when taken in a manner most favorable to the plaintiff it is difficult to see how the various statements, policies and practices amount to the defendants' "undertaking of [some] form of actual contract commitment to him under which [*12] he could not be terminated without just cause. See *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, supra, 212. All statements, except one (Complaint 38), alleged make no mention of the subject of job duration or termination, unlike the statements in *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 662 A.2d 89 (1995) (in response to the plaintiff's preemployment questions about the long-term nature of his job with the defendant, one of the defendant's managers told the plaintiff that if he did a good job, the defendant would "take care" of him and another interviewer told the plaintiff that he hoped that the plaintiff would stay forever); *Finley v. Aetna Life & Casualty Co.*, 202 Conn. 190, 520 A.2d 208 (1987) (The defendant's employee manual provided, in a section subtitled "Involuntary Terminations (Dismissals)," that "it is Company policy to terminate any employee who cannot perform satisfactorily, whose attendance is poor, or who is otherwise unsuited to his job"); or *D'Ulisse-Cupo v. Board of Directors of N.D.H.S.*, 202 Conn. 206, 520 A.2d 217 (1987) (Defendant employer told the plaintiff "that there would be no problem with [*13] her teaching certain courses and levels the following year, that everything looked fine for her rehire for the next year, and that she should continue her planning for the exchange program." A notice posted on the school bulletin board stated: "All present faculty members will be offered contracts for next year").

While the First Count comes perilously close to a failure to state a cause of action for breach of implied contract, "in the absence of 'definitive contract language,' however, 'the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact.' *Bead Chain Mfg. Co. v. Saxton Products, Inc.*, 183 Conn. 266, 274-75, 439 A.2d 314 (1981)." *Finley v. Aetna Life & Casualty Co.*, 202 Conn. 190, 520 A.2d 208 (1987). Therefore, the Motion to Strike the First Count is denied.

Wrongful Termination

In the Third Count the plaintiff claims that the Corporate Defendants wrongfully terminated him in violation of the "public policy" embodied in four sections on the Penal Code, Connecticut General Statutes 53a-96 (unlawful restraint), 53a-188 (tampering with private communications), [*14] 53a-189 (eavesdropping), and 53a-192 (unlawful coercion).

The Connecticut Supreme Court articulated a narrow exception to the employment at will rule when it recognized a common law cause of action in tort for dismissal from employment "if the former employee can prove a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 475, 427 A.2d 385 (1980).

In *Sheets* the plaintiff was employed by the defendant, a producer of frozen food products, as its quality control

director and operations manager. In his capacity as quality control director and operations manager, the plaintiff noticed deviations from the specifications contained in the defendant's standards and labels, in that some vegetables were substandard and some meat components underweight. These deviations violated statutes regulating the labeling of food. In May of 1977, the plaintiff communicated in writing to his employer concerning the violations. His employment was terminated some five months later.

In formulating the so-called "public policy" exception to the employment [*15] at will doctrine, the Court in *Sheets* stated:

> The issue then becomes the familiar common-law problem of deciding where and how to draw the line between claims that *genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not.* We are mindful that courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation. We are, however, equally mindful that the myriad of employees without the bargaining power to command employment contracts for a definite term are entitled to a modicum of judicial protection *when their conduct as good citizens is punished by their employers.*

179 Conn. at 477 (emphasis added).

Under the public policy exception the "defendant's *reason for discharging* the plaintiff must contravene public policy." Battista v. United Illuminating Co., 10 Conn. App. 486, 498, 523 A.2d 1356 (1987) (emphasis added). A discharge is not actionable without "more than an incidental effect on public policy." *Battista*, 10 Conn. App. 486 at 497, 523 A.2d 1356. Where a public policy violation is merely incidental to termination [*16] of employment, the public policy exception does not apply. Thus, in Morris v. Hartford Courant, Co., 200 Conn. 676, 680, 513 A.2d 66 (1986) the Court held that a false but negligently made accusation of criminal conduct did not constitute a public policy violation sufficient to permit the plaintiff to claim wrongful termination under *Sheets.*

As the language of the Court in *Sheets* indicates, the public policy exception was meant to permit the courts to interfere with an employer's "exercise of managerial discretion" in cases where employers sought to punish employees for exercising their rights as good citizens.

The *Sheets* Court relied on the following cases in other jurisdictions in creating the public policy exception:

> Other jurisdictions that have found wrongful and actionable a discharge in retaliation for the exercise of an employee's right to: (1) *refuse to commit perjury*; Petermann v. International Brotherhood of Treasures, 174 Cal. App. 2d 184, 189, 344 P.2d 25 (1959); (2) *file a workmen's compensation claim*; Frampton v. Central Indiana Gas Co., 260 Ind. 249, 252, 297 N.E.2d 425 (1973); Sventko v. Kroger Co., 69 Mich. App. 644, [*17] 648-49, 245 N.W.2d 151 (1976); Brown v. Transcon Lines, 284 Ore. 597, 603, 588 P.2d 1087 (1978); (3) *engage in union activity*; Glenn v. Clearman's Golden Cock Inn, Inc., 192 Cal. App. 2d 793, 798, 13 Cal. Rptr. 769 (1961); (4) *perform jury duty*; Nees v. Hocks, 272 Ore. 210, 216-19, 536 P.2d 512 (1975); Reuther v. Fowler & Williams, Inc., 255 Pa. Super. 28, 31-32, 386 A.2d 119 (1978).

*Sheet*, 179 Conn. at 476 (emphasis added).

The public policy violations present in *Sheets* and the cases relied on by the Court in *Sheets* directly related to the reason for the termination. Mr. Sheets was terminated for attempting to get his employer to comply with the laws concerning the labeling of food. The plaintiffs in the other cases were terminated either for exercising a legal right or duty (jury participation) or for refusing to violate a law (refusing to commit perjury). In this case, the plaintiff does not even claim that he was fired for exercising his rights as a good citizen. Rather, the public policy upon which the plaintiff relies involves the conduct of the employer in investigating or effecting the termination. Courts have uniformly stricken [*18] wrongful termination claims based upon allegedly tortious conduct by the employer during the termination process. Morris v. Hartford Courant, Co., supra, Carbone v. Atlantic Richfield Co., 204 Conn. 460, 528 A.2d 1137 (1987), Doherty v. Sullivan, 29 Conn. App. 736, 618 A.2d 56 (1992), Battista v. United Illuminating Co., 10 Conn. App. 486, 523 A.2d 1356 (1987).

For the foregoing reasons the Motion to Strike the Third Count is granted.

Covenant of Good Faith and Fair Dealing

In the Second Count the plaintiff alleges a breach of the covenant of good faith and fair dealing. An at will

employee cannot pursue an action for breach of an implied covenant of good faith and fair dealing unless his dismissal violates public policy. *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 479 A.2d 781 (1984). As stated above, the plaintiff has failed to allege that his termination violated an important public policy as required by *Sheets*. In *Magnan* the Court refused to allow the plaintiff to invoke the covenant of good faith and fair dealing to convert an employment at will to one requiring cause for termination and observed, "Where employment is clearly terminable [*19] at will, a party cannot ordinarily be deemed to lack good faith in exercising this contractual right." 193 Conn. at 572.

The Court in *Magnan* recognized that the implied covenant of good faith and fair dealing was "essentially . . . a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract." 193 Conn. at 567.

The Restatement (Second) Contracts 205 provides:

Duty of Good Faith and Fair Dealing

> Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.
>
> Comment a. Meanings of "good faith." Good faith is defined in Uniform Commercial Code 1-201(19) as "honesty in fact in the conduct or transaction concerned." . . . Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . .
>
> Comment d. Good faith performance. Subterfuges and evasions violate the obligation of good faith in performance [*20] even though the actor believes his conduct to be justified. But the obligation goes further; bad faith may be overt or may consist of inaction. and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

Illustrations

1. A, owner of a shopping center, leases part of it to B, giving B the exclusive right to conduct a supermarket, . . . During the term of the lease A acquires adjoining land, expands the shopping center, and leases part of the adjoining land to C for a competing supermarket. Unless such action was contemplated or is otherwise justified, there is a breach of contract by A.

6. A contracts to perform services for B for such compensation "as you, in your sole judgment, may decide is reasonable." After A has performed the services, B refuses to make any determination of the [*21] value of the services. A is entitled to their value as determined by a court.

Comment e. Good faith enforcement. The obligation of good faith and fair dealing extends to the assertion, settlement and litigation of contract claims and defenses . . . The obligation is violated by dishonest conduct such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts. It also extends to dealing which is candid but unfair, such as taking advantage of the necessitous circumstances of the other party to extort a modification of a contract for the sale of goods without legitimate commercial reason. See UCC 2-209, Comment 2. Other types of violation have been recognized in judicial decisions: harassing demands for assurances of performance, rejection of performance for unstated reasons, willful failure to mitigate damages, and abuse of a power to determine compliance or to terminate the contract.

Notwithstanding that our Supreme Court has recognized the covenant of good faith and fair dealing as a rule of contract construction, the covenant is widely misused and pled as a separate cause of action which generally [*22] does nothing more than restate a breach of contract claim, or which complains of unfair treatment

regardless of the presence of a contract. The plaintiff illustrated his misunderstanding of the covenant of good faith and fair dealing when he stated:

> Plaintiff has alleged that defendants treated him unfairly, without respect, dishonestly and inequitably. (Complaint, 41.) This is a clear breach of the implied covenant of good faith and fair dealing.

Plaintiff's Memorandum in Opposition to Summary Judgment, p. 22.

The sections of Restatement 205 set forth above make it clear that a breach of the covenant of good faith and fair dealing generally occurs where there is no other contractual breach, or in other words, where the party lacking good faith has adhered to the letter of the contract. For example, if an employer agreed that an employee could be terminated if he did not have an average or better evaluation on the anniversary of his hire date and the employer's supervisor purposely refrained from evaluating the employee (leaving him without an average or better evaluation), then the employer would not violate the terms of the employment contract if it fired the [*23] employee, but its actions would violate the covenant of good faith and fair dealing.

In this case the plaintiff has joined the company of the many who plead a breach of the covenant of good faith and fair dealing as if it were essentially identical to a breach of contract. Here the First Count alleges that the Corporate Defendants impliedly agreed that the plaintiff would only be fired for cause. It further alleges that the Corporate Defendants breached that contract by firing the plaintiff without cause. The Second Count realleges the allegations of the First Count, that is, that the Corporate Defendants breached the alleged implied contract, but contains no separate allegation as to how, other than by terminating his employment, the Corporate Defendants violated the covenant of good faith and fair dealing. The Second Count fails to state a cause of action for the breach of the implied covenant of good faith and fair dealing and is ordered stricken.

### Intentional Infliction of Emotional Distress

In the Fifth Count the plaintiff alleges that the defendants engaged in actions which were extreme and outrageous and designed to cause plaintiff emotional distress. "In order for [*24] the plaintiff to prevail in a case for liability under . . . intentional infliction of emotion distress, four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986).

Whether the defendant's conduct and the plaintiff's resulting distress are sufficient to satisfy either of these elements is a question, in the first instance, for [the] court. Only where reasonable minds differ does it become an issue for the jury. *Reed v. Signode Corp.*, 652 F. Supp. 129, 137 (D.Conn. 1986). Conduct which amounts to "insults, indignities, threats, annoyances, petty oppressions, or other trivialities," will not support a claim for intentional infliction of emotional distress. *Id.* "The actor is never liable . . . where he has done no more than insist upon his rights in a permissible way, [*25] even though he is well aware that such insistence is certain to cause emotional distress." *Petyan v. Ellis*, 200 Conn. at 254-55.

Most of the alleged actions of the defendants with respect to the plaintiff's termination were not extreme and outrageous if the defendants had a good faith reason to believe that the plaintiff had taken bribes from a customer. The plaintiff does not allege a lack of such a good faith belief, but does allege that at various times he denied wrongdoing. A termination of employment alone generally does not give rise to a cause of action for intentional infliction of emotional distress. *Morris, supra*, 200 Conn. at 681-82. However, the complaint contains allegations which go beyond claiming simply that the plaintiff suffered emotional distress as a result of the termination of his employment. When taken in a manner most favorable to the plaintiff, the Fifth Count states a cause of action for intentional infliction of emotional distress. Therefore, the Motion to Strike the Fifth Count is denied.

### Negligent Infliction of Emotional Distress

To sustain a cause of action for negligent infliction of emotional distress, the plaintiff has the burden of pleading [*26] and establishing (1) the defendant should have realized that its conduct involved an unreasonable risk of causing the distress and (2) that the distress, if caused, might result in illness or bodily harm. *Montinieri v. Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978). For the reasons set forth above with respect to the claim for intentional infliction of emotional distress, the court will not strike the Sixth Count.

### Negligent Misrepresentation

In the Seventh Count the plaintiff alleges that the statements which form the basis of his claim for breach of an implied contract also constitute negligent misrepresentations by the defendants. The principles governing a cause of action for negligent misrepresentation are set forth in 552 of the Restatement (Second) Torts:

> One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*D'Ulisse-Cupo* [*27] *v. Board of Directors of N.D.H.S.*, 202 Conn. 206, 217-18, 520 A.2d 217 (1987) quoting Restatement (Second) Torts 552 (1979).

The claim for negligent misrepresentation suffers from the same deficits as that for breach of an implied contract: It is difficult to fathom how the plaintiff relied on the policies and statements alleged to constitute representations that he would only be terminated for cause. However, the success of this count ultimately depends on factual interpretations and, therefore, the Motion to Strike the Seventh Count is denied.

To summarize, the Motion to Strike is granted as to the Second and Third Counts of the Complaint and denied as to the First, Fifth, Sixth, and Seventh Counts of the Complaint.

By the court,

Aurigemma, J.

LEXSEE 2003 U.S. DIST. LEXIS 7056

ALBERT HANNA, Plaintiff, v. INFOTECH CONTRACT SERVICES, INC., and PFIZER, INC., Defendants.

No. 3:01 CV 680 (SRU)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

2003 U.S. Dist. LEXIS 7056; 91 Fair Empl. Prac. Cas. (BNA) 1459

April 21, 2003, Filed

**DISPOSITION:** Defendants' motion for summary judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee filed suit against defendant former employer alleging discrimination under 42 U.S.C.S. § 2000e et seq., and Conn. Gen. Stat. § 46a-60 et seq.; breach of contract and of the covenant of good faith and fair dealing; defamation; and negligent infliction of emotional distress (NIED). He also alleged similar claims against defendant, the employer's client for which the employee worked. Defendants moved for summary judgment.

**OVERVIEW:** The employee alleged that he was fired and forced to endure a hostile work environment on account of his national origin or ethnicity, on account of false allegations relating to sex and his gender, and in retaliation for complaining about being discriminated against. Although the employee produced sufficient evidence to establish a prima facie case of discrimination, defendants rebutted his prima facie case by establishing that he was terminated due to multiple allegations that he harassed female employees of the client and the employee failed to show the reason was pretextual. He also provided no evidence that he was discriminated against on account of his gender or retaliated against for having attempted to make use of dispute resolution mechanisms. The employee's breach of contract claims failed as the contract was terminable-at-will and his termination did not violate public policy. As the employee was not terminated in bad faith, his violation of the covenant of good faith and fair dealing claim failed. The allegedly defamatory statements made by defendants were privileged and the employee did not allege that defendants took any actions that gave rise to a NIED claim.

**OUTCOME:** Defendants' motions for summary judgment were granted.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** [*1] For Albert A Hanna, PLAINTIFF: Jeffrey M Sklarz, Zeisler & Zeisler, PC, Bridgeport, CT. Thomas G Moukawsher, Moukawsher & Walsh, Hartford, CT.

For Infotech Contract SVCS, Inc, DEFENDANT: David R Schaefer, Rowena Amanda Moffett, Brenner, Saltzman & Wallman, New Haven, CT. Roderick MacLeish, Jr, Annapoorni R Sankaran, Greenberg & Traurig, Boston, MA.

For Pfizer, Inc, DEFENDANT: Mary A Gambardella, Steven J Younes, Epstein, Becker & Green, PC, Stamford, CT. Roderick MacLeish, Jr, Greenberg & Traurig, Boston, MA.

**JUDGES:** Stefan R. Underhill, United States District Judge.

**OPINIONBY:** Stefan R. Underhill

**OPINION:**

RULING ON MOTIONS FOR SUMMARY JUDGMENT

Case 3:03-cv-00901-RNC    Document 18-2    Filed 10/23/2003    Page 10 of 15

Page 2

2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

This case arises from the termination of Plaintiff Albert A. Hanna from his position with Defendant InfoTech Contract Services, Inc. ("InfoTech"). Hanna filed suit against InfoTech alleging discrimination under 42 U.S.C. § 2000e et seq. and Conn. Gen. Stat. § 46a-60 et seq.; breach of contract; breach of the covenant of good faith and fair dealing; defamation; and negligent infliction of emotional distress. Hanna also filed suit against InfoTech's client, Pfizer, Inc. ("Pfizer"), alleging discrimination; [*2] tortious interference with contract rights or financial expectancies; defamation; and negligent infliction of emotional distress. InfoTech and Pfizer filed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on all counts (Dkt. Nos. 41, 47). For the following reasons, InfoTech and Pfizer's motions for summary judgment are GRANTED.

## FACTS

Hanna is a United States citizen who was born in Egypt. He is of Arab ethnic background. InfoTech is a technology consulting firm that provides computer support personnel for its clients. Pfizer hired InfoTech to provide long term information technology consultants to work at the Pfizer campus in Groton, Connecticut. On May 18, 1998, Hanna signed a contract (the "1998 agreement") with Winter, Wyman Contract Services, Inc. ("Winter Wyman"), InfoTech's predecessor in interest, to provide computer support services for Pfizer. The parties "approximated" the term of the contract to be three months. Id. at 1. After three months, "employment shall automatically be extended for successive one month periods, unless either party gives notice of its intentions to terminate this Agreement ...." Id. The 1998 agreement [*3] was terminable at will by Winter Wyman, Id. at 2, a fact that Hanna understood when he signed the 1998 agreement. (Hanna Dep. at 33-36.) The parties agreed that the 1998 agreement "shall be construed under the laws of the State of Massachusetts and any action brought as a result of the breach of this contract shall be brought only in a court sitting entirely within the State of Massachusetts and Employee hereby consents to the jurisdiction thereof." Id. In December 1999, Hanna and InfoTech agreed to an extension of "the agreement made on December 20, 1999, between Albert Hanna, and InfoTech Contract Services, Inc., for work performed at Pfizer," until December 30, 2000 (the "1999 extension agreement"). n1 The 1999 extension agreement provides that "all other terms and conditions of the agreement stated above remain in effect." Id.

---

n1 Although the 1999 extension agreement purports to extend a "December 20, 1999" contract, the intention of the parties appears to have been to extend the 1998 agreement. December 20, 1999 is apparently the date of the extension.

---

[*4]

From July 1998 to February 2000, Hanna worked in "managed desktop support," providing computer services to Pfizer. (Hanna Dep. at 40.) Steven Price was in charge of the managed desktop support team to which Hanna was assigned. Id. at 41. Lee Torres and KC Davis were also on Price's team. Id. at 41.

Hanna's responsibilities consisted of responding to requests by Pfizer employees for assistance with computer problems. Each morning Hanna and other managed desktop support personnel would receive computer support request tickets from a dispatcher. (Hanna Dep. at 40.) They would then visit the person requesting assistance at his or her workstation and attempt to resolve the problem. Id. Hanna was assigned to respond to all tickets received from five buildings and three trailers on the Pfizer campus. Id. at 42. In early 2000, approximately fifty percent of Hanna's tickets were from one particular building, building 126, largely because that building had many new employees. Id. at 43. Because Hanna worked four ten-hour days per week, he often worked until 6:00 or 7:00 p. m. (Hanna Aff. P7.) Because he was not given his own work station, he had to use Pfizer employees' [*5] computers to access his data base queue. Id.

Aside from the alleged conduct that would lead to his termination, Hanna had a positive work record at Pfizer. His supervisor, Steven Price, thought Hanna was "a fine technician." (Price Dep. at 42.) Hanna's 1999 evaluation, the only evaluation completed while Hanna worked at Pfizer, had mostly positive things to say about his performance. (Pfizer Central Research MDS Technician Performance Commitments for Albert Hanna, Ex. 5 to Mem. in Opp. to Defs. 'Mots. for Summ. J.) The most noteworthy recommendation was that "[a] more outgoing approach to your client base may help you gain even higher satisfaction ratings from your clients." Id. at 1.

The grounds for Hanna's claims against InfoTech and Pfizer are largely based on an encounter with Glenda Bryant, a Pfizer administrative assistant. Hanna alleges that, during a service call in the summer of 1999, Bryant inquired into Hanna's national origin and ethnicity. (Hanna Aff. P13.) Hanna claims that, upon hearing that he was of Egyptian origin, Bryant stated that she was not comfortable dealing with Arabs because Arabs are terrorists, and "such people should not be allowed into the [*6] country." Id. Hanna alleges that Bryant subsequently told other Pfizer employees that Hanna was

Case 3:03-cv-00901-RNC   Document 18-2   Filed 10/23/2003   Page 11 of 15

Page 3

2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

a security risk. Bryant denies these claims. Hanna further alleges, and Bryant confirms, that she requested that Hanna not be assigned to her computer service requests.

Shortly after the incident with Bryant, Hanna alleges that he complained to his supervisor, Steven Price. (Hanna Aff. at 4.) Price recalled "Albert telling me that he talked with Glenda Bryant about the Middle East, the conflict in the Middle East that was going on and that I think in the same conversation that Albert told me Lee Torres is going over there." (Price Dep. at 64.) Neither Price nor Hanna was aware why Torres was responding to Bryant's service requests. (Id. at 33-35, 65.)

In early February 2000, Pfizer received multiple complaints about Hanna's conduct. On February 1, 2000, Pfizer employee Pamela Close complained to her supervisor, Dr. Jay Stout, that Hanna's behavior toward her made her uncomfortable. (Close Dep. at 43-44; Stout Dep. at 9-17; Turkowski Investigation Notes at 1, Ex. H to the Memo. in Supp. of InfoTech's Mot. for Summ. J. (hereinafter "Turkowski Investigation Notes").) According to [*7] Close, Hanna had repeatedly asked her to dinner, lingered around her after business hours, and became rude when she rebuked his advances. (Close Dep. at 7-17, 33-38; Stout Dep. at 9-17; Turkowski Investigation Notes at 1.) Close complained to Stout after an encounter with Hanna the night before, January 31, 2000, in which Hanna made Close particularly uncomfortable.

Upon receiving this complaint, Stout notified Alison Turkowski of Pfizer's Employee Resources Department. (Stout Dep. at 18; Turkowski Investigation Notes at 1.) Turkowski notified Don McCauley, the Employment Resources representative for Pfizer's Information Technology Department. (Turkowski Investigation Notes at 1.) McCauley contacted Larry Foster, the supervisor of the Pfizer's Information Technology Department. (Foster Investigation Notes at 1, Ex. 12 of Obj. to Defs. 'Mots. for Summ. J. (hereinafter "Foster Investigation Notes"); Turkowski Investigation Notes at 1.) On the basis of this one complaint, Pfizer reassigned Hanna to another building. (Foster Investigation Notes at 1; Hanna Dep. at 68.) Foster contacted Dan Stowe and Jodi Sklar of InfoTech to inform them of the allegations made against Hanna and Pfizer's [*8] decision to reassign Hanna. (Foster Investigation Notes at 1.)

After calling Turkowski, Stout asked Deborah Williams, another Pfizer employee, about Hanna's conduct toward her. (Stout Dep. at 17-18.) The previous week Williams had requested that Stout notify her when he leaves the office in the evening. Id. After hearing Close's complaint, Stout became curious about the motivation for Williams' request, and asked Williams whether it was related to Hanna. Id. She stated that her request was prompted by Hanna's conduct; Hanna made her feel uncomfortable and had once suggested that she sit on his lap while he worked on her computer. (Stout Dep. at 18.) Stout called Allison Turkowski on or around January 3, 2000 informing her that there were additional Pfizer employees she should speak with. (Turkowski Investigation Notes at 1; Stout Dep. at 18.)

In the evening of February 2, 2000, Glenda Bryant had dinner with Williams and Ann Bader. (Bryant Memo., Ex. 11 at 1 to Mem. in Supp. of Pl. 's Opp. to Defs. 'Mot. for Summ. J.) At that dinner, the Pfizer employees discussed the allegations against Hanna. Id.

According to Stout, additional employees came forward to speak with Stout [*9] about Hanna's conduct, including Ellen Olson, Charlene Chomyn, and Glenda Bryant. Id. at 18-19, 26. However, Chomyn denies having discussed Hanna's behavior with anyone prior to Hanna's discharge. (Chomyn Dep. at 24.) In these conversations, Stout heard that Jill Russo and Amy Bowman may have had problems with Hanna. (Stout Dep. at 25-26.) These employees appear to have come forward on February 2 and 3, 2000. After discussing their experiences with them, Stout referred each employee to Turkowski, and notified Turkowski and Foster that additional allegations had been made. (Foster Investigation Notes at 1; Turkowski Investigation Notes at 1; Stout Dep. at 19, 24-25.)

One of the employees making a complaint was Glenda Bryant, who apparently spoke with both Stout and Foster in the morning of February 3, 2000. Bryant stated that Hanna offered to buy her flowers. She was sufficiently uncomfortable with Hanna that she requested that Lee Torres address her computer problems rather than Hanna. Id. at 24.

Meanwhile on February 3, 2000, Turkowski interviewed Close, who relayed the same story she had told Stout. (Turkowski Investigation Notes at 1.) Close also stated that many other [*10] employees had the same experiences she did, including "Charlene Chomyn, Debra Williams, Wendy Kneissbates, Glenda Bryant and maybe Jill Russo and Amy Bowman." Id. Turkowski stated that she then called Charlene Chomyn, who allegedly stated that she was "very uncomfortable" around Hanna, and that he was "too friendly and asking personal questions." Id. As discussed above, Chomyn denies having discussed Hanna's behavior with anyone prior to Hanna's discharge. (Chomyn Dep. at 24.) After speaking with Close and Chomyn, Turkowski called McCauley to relay the what she had found. (Turkowski Investigation Notes at 2.) McCauley indicated at that time that the client had decided to remove Hanna from the assignment with Pfizer. Id.

Case 3:03-cv-00901-RNC    Document 18-2    Filed 10/23/2003    Page 12 of 15

Page 4

2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

Based on the evidence presented, it appears that Pfizer's decision to remove Hanna from the Pfizer account was made at the suggestion of Larry Foster. (Foster Investigation Notes at 2; Hanna Dep. at 60.) Foster suggested to Diane Whitesell and Don McCauley that Pfizer have Hanna removed from its account. Whitesell and McCauley agreed to have Hanna removed from the account. (Foster Investigation Notes at 2; Hanna Dep. at 60.) Whitesell, McCauley, and Foster [*11] appear to have based this decision on the complaints of Close, Williams, Olson and Bryant. They were also aware that Russo and Bowman may have had problems with Hanna, although it is not clear whether Russo and Bowman had been interviewed at the time the decision was made. Foster then notified Dan Stowe, an InfoTech representative on the Pfizer campus, of Pfizer's decision. Stowe then met with Hanna to inform him of the decision. (Foster Investigation Notes at 2; Hanna Dep. at 60, 68.)

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law, under the applicable substantive law." Anderson, 477 U.S. at 248. An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). [*12] Thus, if reasonable minds could differ in the interpretation of evidence that is potentially determinative under substantive law, summary judgment is not appropriate. See R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1995).

When ruling on a summary judgment motion, the court must construe the facts in a light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson, 477 U.S. at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)); Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970) (quoting Diebold, 369 U.S. at 655); see also Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992), cert. denied, 506 U.S. 965, 121 L. Ed. 2d 359, 113 S. Ct. 440 (1992). [*13] The court may not weigh the evidence, even when the court believes such evidence is implausible. See Anderson, 447 U.S. at 249; R.B. Ventures, 112 F.3d at 58-59. Ultimately, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions. ..." Anderson, 447 U.S. at 255.

The moving party bears the initial burden of showing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Langman Fabrics v. Graff Californiawear, 160 F.3d 106, 110 (2d Cir. 1998). However, the movant need not prove an absence of a genuine issue of material fact where the nonmoving party bears the burden of proof. In such circumstances, "the burden on the moving party may be discharged by 'showing' --that is, pointing out to the district court --that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

If the movant has met the initial burden, the burden shifts to the [*14] nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250; see also Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995). The nonmoving party may not rest upon the mere allegations or denials of the pleadings, but rather must present sufficient probative evidence from which a rational trier of fact could find for the nonmovant. Celotex, 477 U.S. at 327; Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).

If the nonmovant fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, summary judgment is appropriate. Celotex, 477 U.S. at 322. In such a situation, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23 (internal quotation marks and citation omitted).

## DISCUSSION

### Discrimination

Hanna alleges in count one of his complaint that InfoTech and Pfizer [*15] discriminated against him in violation of 42 U.S.C. § 2000e et seq. and Conn. Gen. Stat. § 46a-60(a)(1), (a)(4), and (a)(8). Section 2000e(a), Title 42 of the United States Code, prohibits employers from discharging an employee because of his or her "race, color, religion, sex, or national origin." Section 46a-60(a)(1) of the Connecticut General Statutes similarly prohibits employers from firing an employee because of his or her "race, color, religious creed, age,

Case 3:03-cv-00901-RNC    Document 18-2    Filed 10/23/2003    Page 13 of 15

Page 5

2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

sex, marital status, national origin, ancestry, present or past history of mental disorder, mental retardation, learning disability or physical disability." Section 46a-60(a)(4) prohibits firing an employee for filing a complaint about discriminatory practices while Section 46a-60(a)(8) prohibits sexual harassment, either by the employer or the employer's agent. Hanna alleges that he was fired and forced to endure a hostile work environment on account of his national origin or ethnicity, on account of false allegations relating to sex and his gender, and in retaliation for complaining about being discriminated against on account of his national origin or ethnicity.

The court analyzes Hanna's [*16] discrimination claims under the burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and its progeny. Under this framework, the plaintiff must first establish a prima facie case under Title VII, requiring Hanna to show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) despite these qualifications, he was discharged; and (4) his position remained open and was ultimately filled by an employee not in his protected class. Kerzer v. Kingly Mfg., 156 F.3d 396, 401 (2d Cir. 1998). Alternatively, Hanna may satisfy the fourth element by establishing that the decision occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class. Id. at 401. "A plaintiff's burden to establish a prima facie case of discrimination is de minimis." Id. Once the plaintiff has made out a prima facie case, the employer is required to offer a legitimate, non-discriminatory business rationale for its actions. Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994). If the employer [*17] articulates such a reason, the plaintiff has the burden of proving that the proffered reason was a pretext for discrimination. Id.

Hanna has produced sufficient evidence to establish a prima facie case of discrimination. Defendants allege that Hanna did not satisfactorily perform his duties because he had sexually harassed employees. However, the allegations of sexual harassment are the allegedly pretextual rationale for firing Hanna, and are more appropriately discussed under prongs two and three of the McDonnell Douglas test. Hanna did submit a performance review that was largely positive, and his supervisor believed he was "a fine technician." In light of this evidence, the court finds that Hanna has produced sufficient evidence that his performance was satisfactory to make a prima facie case.

Defendants also argue that Hanna has not established that his position remained open and was ultimately filled by an employee not in his protected class. Specifically, defendants argue that "Hanna's duties were absorbed by incumbent employees/contractors, who were working at Pfizer prior to Hanna's discharge." (Mem. in Supp. of InfoTech's Mot. for Summ. J. at 10.) Hanna's supervisor [*18] at Pfizer, Steven Price, stated that he took over Hanna's responsibilities after InfoTech removed him. (Price Dep. at 12-13; Foster Investigation Notes at 1.) The evidence does not indicate whether Price is in a protected class. Hanna alleges that Torres took over his responsibilities. (Hanna Aff. at 5.) Torres agrees that he took over "a lot" of Hanna's responsibilities. (Torres Dep. at 9.) Torres is not in Hanna's protected class. (Hanna Aff. P14.) Although InfoTech did not hire someone to replace Hanna, at least one employee who was not in Hanna's protected class did assume many of his responsibilities. The court concludes that this is sufficient to meet the fourth element of a prima facie case of discrimination.

The Defendants have rebutted Hanna's prima facie case by establishing that Hanna was terminated as a result of multiple allegations that he harassed female employees of Pfizer. Pfizer made the decision to have Hanna removed from its account after receiving sexual harassment complaints from at least four Pfizer employees. Pfizer was additionally aware that at least two other employees were harassed by Hanna. Pfizer documented its investigation and the defendants have provided [*19] ample evidence of the complaints against Hanna.

The burden therefore shifts back to Hanna to prove that discrimination was the real motivation for his termination. Hanna's theory of discrimination in this case is that a non-supervisory employee hatched a conspiracy to fabricate sexual harassment claims against him because of his ethnic background or national origin. The only evidence of bias, prejudice, or racism is Hanna's allegation that Bryant, an administrative assistant, made prejudicial comments about Arabic people. Assuming Hanna's allegation is true and Bryant did make such statements, this alone would not be sufficient to prove that InfoTech fired Hanna because of his ethnicity or race. Evidence of a single conversation with a non-supervisory employee regarding her beliefs that Arabs are terrorists would not permit a reasonable jury to find that Hanna was fired because of his ethnicity.

Hanna further alleges that because Bryant allegedly does not trust Arabic people, she fabricated her sexual harassment claim against Hanna and, at a dinner on February 2, 2000, convinced two co-workers to fabricate their sexual harassment claims against Hanna. However, Hanna has provided [*20] no evidence of a conspiracy to fabricate claims. The fact that Williams, Bader, and Bryant had dinner together does not tend to prove that their claims were fabrications. Bryant had complained to Stout the day before the dinner occurred, and it is not

Case 3:03-cv-00901-RNC   Document 18-2   Filed 10/23/2003   Page 14 of 15

Page 6
2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

clear that Bader ever made a sexual harassment claim against Hanna. Even if Bader did have a complaint against Hanna, it had not been brought to Pfizer's attention at the time the decision was made to have Hanna removed. More importantly, the majority of women making complaints against Hanna were not present at the dinner. Hanna thus has not demonstrated any link between Bryant's alleged discriminatory statements and the complaints of other employees against Hanna.

Hanna similarly has not provided any evidence that the sexual harassment claims were just a pretext for Pfizer's decision to have Hanna removed. Even if Bryant's claim was a fabrication motivated by prejudice, Foster, Whitesell and McCauley had received at least three other sexual harassment claims and knew of at least two additional women who were alleged to have been sexually harassed by Hanna at the time they made the decision. Hanna has not provided any evidence, other [*21] than his own denials, that their claims are false. In light of the numbers and seriousness of the allegations against Hanna, and the absence of evidence that Pfizer's reasons were pretextual, no reasonable jury could find that the sexual harassment claims were a pretext for having Hanna removed. A reasonable jury could not conclude, on the basis of statements allegedly made only by a single, non-supervisory employee, that Pfizer was motivated by prejudice.

Hanna has also provided no evidence that he was discriminated against on account of his gender, or retaliated against for having attempted to make use of dispute resolution mechanisms after Bryant allegedly made the prejudicial statements. Although Hanna did relay Bryant's statements to Price, his supervisor, there is no evidence that Hanna was attempting to initiate dispute resolution, that Price relayed the statements to anyone else, or that Price had any say in the decision to have Hanna removed. Other than the statements allegedly made by Bryant on a single occasion, Hanna has provided no evidence to support the claim that he had to endure a hostile work environment. Accordingly, Hanna's discrimination claim cannot survive summary [*22] judgment.

Breach of contract

In count two his complaint, Hanna alleges that InfoTech violated its employment contract with Hanna by wrongfully discharging him. The general rule under Massachusetts law is that "an employment-at-will contract can be terminated at any time for any reason or for no reason at all." Folmsbee v. Tech School Grinding Supply, Inc., 417 Mass. 388, 394, 630 N.E.2d 586 (1994); see also Jackson v. Action for Boston Community Dev., Inc., 403 Mass. 8, 9, 525 N.E.2d 411 (1988). The exception to the rule is that employees in certain circumstances can seek redress for terminations in violation of public policy. Folmsbee, 417 Mass. at 394. The employee can seek redress for public policy violations if the employee was fired "for asserting a legally guaranteed right (e. g., filing workers' compensation claim), for doing what the law requires (e. g., serving on a jury), or for refusing to do what the law forbids (e. g., committing perjury)." Id. (quoting Smith-Pfeffer v. Superintendent of the Walter E. Fernald State School, 404 Mass. 145, 149-50, 533 N.E.2d 1368 (1989)).

Hanna claims that his [*23] discharge was wrongful because the contract was not terminable at will. However, the initial contract between Hanna and Winter Wyman expressly provided that Winter Wyman could terminate the contract at will. Hanna understood this when he signed the agreement. The agreement extensions did not modify the terms of the original agreements, providing that "all other terms and conditions of the agreement stated above remain in effect." (1999 extension agreement.) Accordingly, Hanna's claim that his discharge was wrongful because the contract was not terminable-at-will fails.

Hanna also alleges that InfoTech wrongfully discharged him because his termination violated public policy. Specifically, Hanna alleges his termination violated public policy because he was fired on account of his national origin, ethnicity, or gender; and because he was discharged in retaliation for his good faith attempt to make use of the company's dispute resolution procedures. Both of these arguments fail because, as discussed above, Hanna was discharged for sexually harassing Pfizer employees. Hanna has submitted no evidence that he was discharged on account of his race, ethnicity, or gender, or for having made [*24] use of the dispute resolution mechanisms. Accordingly, defendants are entitled to summary judgment on count two.

Breach of the covenant of good faith and fair dealing

Count three of Hanna's complaint alleges a violation of the covenant of good faith and fair dealing, stating that "by its unlawful actions, in terminating the plaintiff's employment, InfoTech violated the covenant of good faith and fair dealing that is implied in every contract for employment." The Massachusetts Supreme Judicial Court has held that a "bad faith" termination constitutes a breach of an at-will employment contract. Fortune v. National Cash Register Co., 373 Mass. 96, 101-02, 364 N.E.2d 1251 (1977). However, no reasonable jury could find that InfoTech terminated Hanna in bad faith. As discussed above, InfoTech fired Hanna after its client complained that Hanna had harassed its employees on multiple occasions. Hanna has not produced any

Case 3:03-cv-00901-RNC   Document 18-2   Filed 10/23/2003   Page 15 of 15

Page 7

2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

evidence rebutting InfoTech's good faith rationale for terminating him.

Tortious interference with contract rights or financial expectancies

Count four of Hanna's complaint alleges that Pfizer tortiously interfered with Hanna's contract rights by [*25] inducing InfoTech to break its contract with Hanna. The Connecticut Supreme Court has made clear that not all conduct that disrupts a contract constitutes tortious interference. n2 Blake v. Levy, 191 Conn. 257, 260, 464 A.2d 52 (1983); Weiss v. Wiederlight, 208 Conn. 525, 535, 546 A.2d 216 (1988). "For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ...or that the defendant acted maliciously." Blake, 191 Conn. at 261 (internal quotation marks and citations omitted); Weiss, 208 Conn. at 535 (internal quotation marks and citations omitted). In Connecticut, the burden of establishing an improper purpose is on the plaintiff. Blake, 191 Conn. at 262 ("In an action for intentional interference with business relations we think the better reasoned approach requires the plaintiff to plead and prove at least some improper motive or improper means.").

 n2 Connecticut law governs Hanna's tort claims.

[*26]

Because Hanna has produced no evidence linking the prejudicial statements Bryant allegedly made to Pfizer's decision to request that InfoTech remove Hanna, and because Hanna has not otherwise been able to rebut Pfizer's non-discriminatory motive for its conduct, a reasonable jury could not conclude that Pfizer acted maliciously. Accordingly, summary judgment on count four is appropriate.

Defamation

Count six of Hanna's complaint alleges that "Pfizer's actions ...constituted false, malicious, willful, wanton, reckless, and/or negligent written and oral publications charging Hanna with sexual harassment ...." (Compl. P30 at 11-12.) To prove that the defendants are liable for defamation, Hanna must establish that Pfizer and InfoTech published false statements that harmed him, and that the defendants were not privileged to do so. Torosyan v. Boehringer Ingelheim Pharmaceuticals, 234 Conn. 1, 27, 662 A.2d 89 (1995).

Outside of the vague description given in the complaint, Hanna has failed to provide any additional detail of the facts giving rise to his defamation claims against Pfizer and InfoTech. There is no evidence that either Pfizer or InfoTech relayed information [*27] regarding Hanna's termination to anyone outside of their respective companies, or that the information relayed within each company was not limited to that necessary to investigate the allegations against Hanna and to terminate him. (Hanna Dep. at 319-20.)

The allegedly defamatory statements made by the defendants were privileged. See Miles v. Perry, 11 Conn. App. 584, 529 A.2d 199 (1987) ("It is for the court to determine, as a matter of law, whether the defendant made the defamatory statements while acting on an occasion of privilege ...."). Statements made within each corporation, either to protect against sexual harassment or to review and terminate Hanna's employment are privileged. See Johnson v. Chesebrough-Pond's U.S.A. Co., 918 F. Supp. 543 (D. Conn. 1996) ("To the extent plaintiffs are alleging that Johnson was defamed by intracorporate communications, we also note that such communications are protected by a qualified privilege. ... Communications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege.") (internal quotation [*28] marks and citation omitted). Hanna acknowledges this proposition of law. (Mem. in Supp. of Obj. to Mot. 's for Summ. J. at 21 ("While a company attempting to shield its employees from sexual harassment enjoys a conditional privilege to take steps needed to accomplish this purpose, the privilege is lost where there is an improper motive lurking behind the statements.").)

Under Connecticut law, "[a] conditional or qualified privilege may be abused or lost if the defendant published or broadcast the defamatory remarks with malice, improper motive, or bad faith." Miles v. Perry, 11 Conn. App. 584, 529 A.2d 199, 205 (1987). Contrary to Hanna's claim, there is no evidence that the defendants were acting in bad faith; they therefore did not lose their privilege. As discussed above, Hanna has provided no evidence either that he was terminated for any reason other than for sexually harassing Pfizer employees or that he was in fact terminated on account of his race, ethnicity, or sex, or for invoking dispute resolution mechanisms. Therefore, there is no evidence from which a reasonable jury could conclude that the allegedly defamatory statements were not privileged, and summary [*29] judgment on count five is appropriate.

Negligent infliction of emotional distress

To prove a claim of negligent infliction of emotional distress, Hanna must establish that InfoTech and Pfizer